**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| IN RE: THOMPSON COBURN DATA SECURITY LITIGATION<br><br>This Document Relates To: All Matters | Master File No. 4:24-cv-1509<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jason Salazar, Kristin Tafoya, Denise Sandoval Duran, Heidi Mathiasen, Paula Ortiz, M.R., D.L. through their next of friend Johnny Madrid, Kristen Cochrane, Mary Martinez, and Mikah Wuorinen ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Defendants Thompson Coburn, LLP ("Thompson") and Presbyterian Healthcare Services ("Presbyterian"), collectively ("Defendants") on behalf of themselves and all others similarly situated, and allege, upon information and belief, except as to their own actions, the investigation of counsel, and facts that are a matter of public record:

## INTRODUCTION

1.     This civil action pursues monetary damages as well as injunctive and declaratory relief from Defendants, stemming from their negligence in safeguarding specific Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (collectively, "Private Information").

2.     Between May 28, 2024 and May 29, 2024, an unknown actor grained access to Thompson's network systems, resulting in the unauthorized disclosure and, upon

information and belief, exfiltration of Plaintiffs' and more than 300,000 other Class Members' (as defined below) Private Information (the "Data Breach"). Such Private Information encompasses, but is not limited to, name, Social Security number, medical record number, patient account number, prescription/treatment information, clinical information, and medical provider information.

3.      Thompson is a nationwide general practice law firm with experience in data breach litigation with its primary office in St. Louis, Missouri.[1]

4.      Presbyterian is a healthcare provider that owns and operates nine hospitals throughout New Mexico, as well as a health insurance plan. Presbyterian provided Thompson with access to its patients' files in connection with receiving legal services.

5.      Plaintiffs and Class Members entrusted their sensitive Private Information to Defendants, with the mutual understanding that it would be protected against disclosure. However, due to the Data Breach, this Private Information was targeted, compromised, and unlawfully accessed.

6.      Defendants systematically collected and maintained specific Private Information of Plaintiffs and putative Class Members. These individuals are current or former patients of Presbyterian and their Private Information includes protected health information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

---

[1] THOMPSON COBURN, *Services: Practices, Cybersecurity, Privacy, and Data Governance* https://www.thompsoncoburn.com/services/cybersecurity-privacy-and-data-governance/ (last visited Feb.10, 2025).

7.    The Data Breach occurred because Defendants failed to implement reasonable security procedures and practices, failed to disclose material facts surrounding their deficient data security protocols, and failed to timely notify the victims of the Data Breach.

8.    As a result of Defendants' failure to protect the sensitive information they were entrusted to safeguard, Plaintiffs and Class Members did not receive the benefit of their bargain and now face a significant risk of medical-related identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## JURISDICTION AND VENUE

9.    The Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiffs, are citizens of a state different from one of the Defendants.

10.    The Court has general personal jurisdiction over Defendant Thompson because its headquarters and principal place of business is located in Missouri.

11.    The Court has specific personal jurisdiction over Defendant Presbyterian because it purposefully availed itself of the laws of Missouri by providing its patients' Private Information to Defendant Thompson in Missouri, indicating a deliberate engagement with the markets here. Consequently, the exercise of jurisdiction by the Court is not only justified but also appropriate, given Thompson's intentional involvement in Missouri's economic activities.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) due to Thompson's principal place of business in this District. Moreover, a significant portion of the events and omissions that form the basis of this action transpired within this District. Hence, it is appropriate that this Court serves as the venue for adjudicating this matter.

## PARTIES

13.     Plaintiff Jason Salazar is a resident and citizen of the state of New Mexico.

14.     Plaintiff Kristin Tafoya is a resident and citizen of the state of New Mexico.

15.     Plaintiff Denise Sandoval Duran is a resident and citizen of the state of New Mexico.

16.     Plaintiff Heidi Mathiasen is a resident and citizen of the state of New Mexico.

17.     Plaintiff Paula Ortiz is a resident and citizen of the state of New Mexico.

18.     Plaintiff M.R. is a resident and citizen of the state of New Mexico.

19.     Plaintiff D.L., a minor child, is a resident and citizen of New Mexico and brings this suit through their guardian, Johnny Madrid.

20.     Plaintiff Kristen Cochrane is a resident and citizen of the state of New Mexico.

21.     Plaintiff Mary Martinez is a resident and citizen of the state of New Mexico.

22.     Plaintiff Mikah Wuorinen is a resident and citizen of the state of New Mexico.

23.     Defendant Thompson is a Missouri limited liability partnership with its headquarters and principal place of business located at One US Bank Plaza, Suite 2500, Saint Louis, Missouri 63101.

24.    Defendant Presbyterian is a New Mexico corporation with its headquarters and principal place of business located at 5921 San Mateo Blvd. NE, Albuquerque, New Mexico 87109.

## FACTUAL ALLEGATIONS

*Defendants Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims.*

25.    Thompson is a law firm that holds itself out as a nationwide full-service law firm with offices located in Brimingham, Chicago, Dallas, Los Angeles, New York, Southern Illinois, St. Louis and Washington, D.C. It represents that it uses "state-of-the-art technology."[2]

26.    Thompson, as it represented to current and prospective clients, was aware that "security breaches continue to increase the importance of addressing and mitigating risks before an attack occurs."[3]

27.    On information and belief, as part of its practice, Thompson collects and stores the Private Information of third-party patients from Presbyterian.

28.    As a self-proclaimed expert in data privacy and security and handling highly sensitive aspects of its clients' business, Thompson understood the need to protect its clients' patients' data and prioritize its data security.

29.     Presbyterian is a hospital system located in New Mexico comprised of nine

---

[2] THOMPSON COBURN, OVERVIEW https://www.thompsoncoburn.com/about-us/overview/ / (last visited Feb. 11, 2025).
[3] THOMPSON COBURN, SERVICES: PRACTICES, CYBERSECURITY https://www.thompsoncoburn.com/services/cybersecurity-privacy-and-data-governance/ (last visited Feb. 11, 2025).

hospitals, a multi-specialty medical group with more than 900 providers and a statewide health plan. One in three New Mexicans are served by Presbyterian.[4] It is "New Mexico's largest private employer with over 13,000 employees."[5]

30.    In its privacy policy, Presbyterian promises that it has "policies and procedures to protect the privacy of health information that [] identif[ies] you," including:

- "We have a training program to educate our employees and others about our privacy policies."

- "Your health information is only used or shared for our business purposes or as otherwise required or allowed by law."

- "When a service involving your health information is being performed by a third party, we require a written agreement with them to protect the privacy of your health information."

- "We are required by law to maintain the privacy of your health information."

- "We have a legal duty to notify you, and you have a right to know when your protected health information has been inappropriately accessed, used, or disclosed as a result of a breach."

- "We will not use or share your health information without your written

---

[4] PRESBYTERIAN, *About Us*, https://www.phs.org/about-us (last visited Feb. 10, 2025).
[5] Dave Muoio, *UnityPoint Health, Presbyterian Healthcare Services Call Off $11B Merger*, FIERCE HEALTHCARE (Oct. 11, 2023) https://www.fiercehealthcare.com/providers/unitypoint-health-presbyterian-healthcare-services-call-11b-merger.

authorization unless required by law."[6]

31.    As part of the process of collecting Private Information from patients, including Plaintiffs, Presbyterian pledged to ensure confidentiality and adequate security for the data it gathered from patients. This commitment was articulated through its relevant privacy policy, patient's rights handout, and other disclosures, adhering to statutory privacy requirements. Specifically, Presbyterian represented that Plaintiffs and other patients have the right to "have confidentiality of your medical records and personal information."[7]

32.    Plaintiffs and the Class Members, as patients of Presbyterian, trusted these assurances and counted on this sophisticated business entity to maintain the confidentiality and security of their sensitive Private Information. They expected Presbyterian to use this information solely for business purposes and to make only authorized disclosures. Patients, in general, insist on security measures to protect their Private Information, particularly when it involves sensitive details including healthcare information.

33.    Despite recognizing its duty to do so, on information and belief, Presbyterian has not implemented reasonable cybersecurity safeguards or policies to protect its patients' Private Information or adequately supervised its IT or data security agents and employees, including Thompson, to prevent, detect, and stop breaches of its systems. As a result, Presbyterian left significant vulnerabilities in its use and storage of

---

[6]    *Joint    Notice    of    Privacy    Practices*, PRESBYTERIAN, https://onbaseext.phs.org/PEL/DisplayDocument?ContentID=wcmprod1029971    (last visited Feb. 12, 2025).

[7] *You Have the Right*, PRESBYTERIAN, https://onbaseext.phs.org/PEL/DisplayDocument?ContentID=PEL_00182934 (last visited Feb. 12, 2025).

Plaintiffs and Class Members' Private Information for cybercriminals to exploit and gain access that information.

*The Data Breach*

34.    As a condition of receiving services from Presbyterian, Presbyterian requires its patients to disclose Private Information including but not limited to, their names, medical records numbers, patient account numbers, prescription/treatment information, clinical information, and medical provider information. Presbyterian used that Private Information to facilitate its business and provision of services to Plaintiffs, and required Plaintiffs to provide that Private Information to obtain services.

35.    Presbyterian provided Thompson with Plaintiffs' Private Information as part of the legal services Thompson provided to Presbyterian. Thus, Thompson was granted access and custody of Plaintiffs' Private Information including but not limited to name, medical records number, patient account number, prescription/treatment information, clinical information, and medical provider information.

36.    Defendants collect and maintain patients' sensitive Private Information in their computer systems.

37.    In collecting and maintaining the Private Information, Defendants agreed to safeguard the data using reasonable means according to their internal policies and applicable law.

38.    Thompson first detected suspicious activity on May 29, 2024. Following an internal investigation, Thompson discovered that between May 28 and May 29, 2024, a cyber-criminal viewed or took information stored within Thompson's systems.

39.     Thompson admitted that "certain files stored within our environment were viewed or taken by an unauthorized actor between May 28, 2024, and May 29, 2024."[8]

40.     More specifically, Thompson admitted that Private Information was "within the affected files and thus subject to ***unauthorized access and acquisition*** by the unauthorized actor."[9]

41.     Despite representing itself as an expert in cybersecurity, Thompson's own data security policies and systems were inadequate and permitted a cyber-criminal to compromise the files of hundreds of thousands of Presbyterian patients. Presbyterian failed to exercise sufficient due diligence in verifying and overseeing Thompson's data security policies and systems. By entrusting Thompson with patients' Private Information without proper oversight or ensuring robust safeguards, Presbyterian directly contributed to the Data Breach.

42.     It was not until nearly 6 months later, November 6, 2024, that Defendants provided notice to Plaintiffs and the Class that they had suffered a Data Breach.

43.     In total, the Data Breach compromised the Private Information of 305,088 individuals.[10]

44.     The types of Private Information exposed in the Data Breach include:

---

[8] *Notice of Data Security Incident*, THOMPSON COBURN, https://tcnotification.com/ (last visited Feb. 12, 2025).

[9] *Notice of Data Event*, NEW HAMPSHIRE ATTY GEN (Dec. 31, 2024) https://mm.nh.gov/ files/uploads/doj/remote-docs/thompson-coburn-20241231.pdf (emphasis added).

[10] *Cases Currently Under Investigation*, US DEPT HEALTH & HUMAN SERVS (Nov. 4, 2024) https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf;jsessionid=570E49AB7419B454E9 CFCD4606AB650D.

- names;

- Social Security numbers;

- dates of birth;

- medical record numbers;

- patient account numbers;

- prescription information;

- treatment information;

- clinical information;

- medical provider information;

- health insurance information;

- driver's license information; and

- financial account information.[11]

45.    Despite a lack of transparency about the root cause of the incident, the Notice reveals key facts: a) the Data Breach was perpetrated by cybercriminals; b) these cybercriminals initially breached Thompson's networks and systems, subsequently viewing or exfiltrating data; and c) within Thompson's networks and systems, the cybercriminals specifically targeted information, potentially including Plaintiffs' and Class Members' Private Information and other sensitive data for download and theft.

46.    The Notice provided by Thompson is deficient, failing to provide critical

---

[11] *Data Breach Notification Report*, MASS ATTY GEN, https://www.mass.gov/doc/data-breach-report-2024/download (last visited Feb. 12, 2025); *Notice of Data Security Incident*, THOMPSON COBURN, https://tcnotification.com/ (last visited Feb. 12, 2025).

information about the Data Breach. For example, the Notice omits when the sensitive Private Information was taken by the unauthorized party, when Thompson "launched an investigation," the full extent of the data accessed or exposed, when Thompson took action to stop the breach, whether the breach has been fully remediated, and how Thompson confirmed what information was accessed.

47.    Defendants provide no explanation for why they let the Private Information of Plaintiffs and Class Members sit in the hands of the criminal hackers for nearly six months after they detected the breach before attempting to notify affected patients.

48.    By waiting to disclose the Data Breach and by downplaying the risk that victims' Private Information would be misused by criminals, Defendants prevented victims from taking meaningful, proactive, and targeted mitigation measures to protect themselves from harm.

***Presbyterian's Prior Data Breach***

49.    Notably, this Data Breach is only part and parcel of Defendants' history of negligent data security.

50.    On or around May 9, 2019, Presbyterian was hacked via "a scam or deceptive email trying to get information, known as 'phishing.'"[12]

51.    Later, "on June 6, 2019, Presbyterian discovered anonymous, unauthorized access gained through a deceptive email to some of Presbyterian's workforce

---

[12]    *Data    Breach    Notice*, CAL ATTY GEN (Aug. 2, 2019) https://oag.ca.gov/system/files/SSN%20Final%20Proof%20%28Updated%29-07-30-2019.pdf.

members[.]"[13]

52.    The data breach exposed its patients' Private Information—including their names, Social Security numbers, dates of birth, clinical information, and health insurance information.[14]

53.    In total, the 2019 data breach exposed the private information of approximately 183,370 patients.[15]

**Preventing Data Breaches: Safeguarding Against Unnecessary Compromises**

54.    Defendants neglected to employ adequate security procedures and practices suitable for the sensitive nature of the information entrusted to them by Plaintiffs and Class Members. This failure resulted in unauthorized access to and exfiltration of Private Information, exposing Defendants' failure to employ industry standard measures such as encryption or timely deletion when the information was no longer necessary.

55.    Defendants could have averted this Data Breach by taking necessary precautions such as appropriately encrypting or implementing robust protection measures for their equipment and computer files containing Private Information.

56.    As stated by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware, and it is crucial to implement precautionary

---

[13] *Id.*

[14] *Id.*

[15] Steve Alder*, Presbyterian Healthcare Services Agrees to Settle Email Breach Lawsuit*, THE HIPAA JOURNAL (May 7, 2024) https://www.hipaajournal.com/presbyterian-healthcare-services-agrees-settlementemail-breach-lawsuit/.

measures for protection."[16]

57.     To effectively prevent and detect cyberattacks and ransomware incidents, Defendants could have implemented the following measures, as recommended by the United States Government:

- Awareness and Training Program: Develop and implement a comprehensive awareness and training program to educate employees and individuals about the threat of ransomware and how it is typically delivered.

- Strong Spam Filters: Enable robust spam filters to block phishing emails from reaching end users. Utilize technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to authenticate inbound email and prevent email spoofing.

- Email Scanning: Scan all incoming and outgoing emails to detect threats and filter out executable files from reaching end users.

- Firewall Configuration: Configure firewalls to block access to known malicious IP addresses.

- Patch Management: Regularly patch operating systems, software, and firmware on devices. Consider implementing a centralized patch management system for efficiency.

- Anti-virus and Anti-malware Programs: Set up anti-virus and anti-malware programs to conduct automatic regular scans.

- Privileged Account Management: Manage privileged accounts based on the principle of least privilege, restricting administrative access only to those who absolutely require it and limiting usage to necessary situations.

- Access Controls: Configure access controls, including file, directory, and network share permissions, with the principle of least privilege in mind.

- Macro Script Disabling: Disable macro scripts from office files transmitted via email. Consider using Office Viewer software for opening Microsoft Office files transmitted via email instead of full office suite applications.

---

[16] *How to Protect Your Networks from Ransomware*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Feb. 12, 2025).

- Software Restriction Policies (SRP): Implement SRP or similar controls to prevent programs from executing from common ransomware locations.

- Remote Desktop Protocol (RDP) Disablement: Consider disabling Remote Desktop Protocol (RDP) if it is not in active use.

- Application Whitelisting: Utilize application whitelisting to only allow systems to execute programs that are known and permitted by security policy.

- Virtualized Environment Execution: Execute operating system environments or specific programs in a virtualized environment to enhance security.

- Data Categorization and Separation: Categorize data based on organizational value and implement both physical and logical separation of networks and data for different organizational units.[17]

58.    To effectively prevent and detect cyberattacks or ransomware incidents, Defendants could have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

**Secure Internet-Facing Assets**

Apply latest security updates
Use threat and vulnerability management
Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

---

[17] *Id.*

**Apply principle of least-privilege**

Monitor for adversarial activities
Hunt for brute force attempts
Monitor for cleanup of Event Logs
Analyze logon events;

**Harden infrastructure**

Use Windows Defender Firewall
Enable tamper protection
Enable cloud-delivered protection
Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[18]

59.    Considering that Defendants were entrusted with storing the Private Information of both current and former patients, it was imperative for them to implement all of the aforementioned measures to effectively prevent and detect cyberattacks.

60.    The Data Breach underscores Defendants' failure to sufficiently implement one or more of the aforementioned measures aimed at preventing cyberattacks. This lapse led to the Data Breach, enabling data thieves to access and acquire the Private Information of hundreds of thousands of individuals, including Plaintiffs and Class Members.

***Defendants' Acquisition, Collection, and Storage of Patients' Private Information***

61.    Presbyterian accumulates, gathers, and maintains an extensive volume of Private Information concerning both its present and past patients.

62.    As a prerequisite for becoming a patient of Presbyterian or purchasing medical supplies from the organization, Presbyterian mandates that patients and other

---

[18] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT SECURITY (Mar. 5, 2020) https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

individuals entrust it with highly sensitive personal information.

63.    By acquiring, gathering, and utilizing the Private Information of Plaintiffs and Class Members, Presbyterian undertook legal and equitable obligations. It was well aware, or should have been, of its responsibility to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

64.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Presbyterian absent a promise to safeguard that information.

65.    Upon information and belief, during the process of collecting Private Information from patients, including Plaintiffs, Presbyterian purportedly pledged to ensure confidentiality and sufficient security for their data. This commitment was purportedly articulated through its relevant privacy policy and other disclosures, in adherence to statutory privacy mandates.

66.    On its website, Presbyterian assures that the site is equipped with security measures to prevent loss, misuse, or alteration of information within its purview.

67.    Plaintiffs and the Class Members placed their trust in Defendants to uphold the confidentiality and secure maintenance of their Private Information, to utilize this data solely for business purposes, and to make authorized disclosures of this information only.

***Defendants' Awareness of Cybersecurity Risks to Healthcare Entities Handling Private Information***

68.    Given the significant rise in cyberattacks and data breaches targeting healthcare entities responsible for collecting and storing Private Information, such as

Defendants, prior to the breach date, Presbyterian's data security obligations were of paramount importance.

69.    Data breaches, including those directed at healthcare and healthcare adjacent entities housing Private Information within their systems, have proliferated extensively.

70.    In the third quarter of the 2023 fiscal year alone, 733 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[19]

71.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including Change Healthcare (potentially hundreds of millions of patients, March 2024), HCA Healthcare (11-million patients, July 2023), Managed Care of North America (8-million patients, March 2023), PharMerica Corporation (5-million patients, March 2023), HealthEC LLC (4-million patients, July 2023), ESO Solutions, Inc. (2.7-million patients, September 2023), Prospect Medical Holdings, Inc. (1.3-million patients, July-August 2023), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

72.    Cyberattacks have garnered such notoriety that both the Federal Bureau of Investigation and the U.S. Secret Service have issued warnings to potential targets, aiming to alert them and fortify their readiness against potential attacks. As elaborated in one report, smaller entities tasked with storing Private Information are particularly appealing

---

[19] *Q3 2023 Data Breach Analysis: Record Smashed! How Many Data Breaches Will be Reported in 2023?*, Identity Theft Resource Center, https://www.idtheftcenter.org/wp-content/uploads/2023/10/20231011_Q3-2023-Data-Breach-Analysis.pdf (last visited Feb. 12, 2025).

to ransomware criminals due to their typically weaker IT defenses and strong incentive to swiftly regain access to their data.[20]

73.    Moreover, as businesses increasingly rely on computer systems to conduct their operations, for instance, through remote work necessitated by the Covid-19 pandemic, and the proliferation of the Internet of Things (IoT), the threat posed by cybercriminals is amplified. This underscores the imperative for implementing sufficient administrative, physical, and technical safeguards.[21]

74.    Defendants were aware that unprotected or exposed Private Information, held by health and health adjacent companies like themselves, holds significant value and is highly coveted by malicious third parties aiming to unlawfully profit from such information through unauthorized access.

75.    Defendants were aware, or reasonably should have been aware, of the criticality of safeguarding the Private Information belonging to Plaintiffs and Class Members. Moreover, they were cognizant of the foreseeable repercussions in the event of a breach in its data security system, notably the substantial costs that would burden Plaintiffs and Class Members as a consequence of such a breach.

76.    Plaintiffs and Class Members are now confronted with enduring years of persistent monitoring of their financial and personal records, along with a loss of privacy

---

[20] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019) https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[21] Dr. Suley Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS (Mar. 24, 2022) https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

rights. This ongoing surveillance inflicts and will persist in causing significant damages to Plaintiffs and Class Members, compounded by the potential fraudulent exploitation of their Private Information.

77.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

78.    The consequences stemming from Defendants' failures to secure the Private Information of Plaintiffs and Class Members are enduring and profound. Following the theft of Private Information, the potential for fraudulent exploitation and the resultant harm to victims can persist for years.

79.    As healthcare and healthcare adjacent entities responsible for safeguarding the Private Information of patients, Defendants were fully aware, or should have been, of the criticality of protecting the Private Information entrusted to them by Plaintiffs and Class Members. Moreover, Defendants should have recognized the foreseeable consequences should their data security systems be breached, including the substantial costs imposed on Plaintiffs and Class Members. However, Defendants failed to implement sufficient cybersecurity measures to avert the Data Breach.

*Value of Private Information*

80.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without

authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

81.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[24]

82.     Private information can be sold at a price ranging from $40 to $200 or even higher.[25]

83.     Furthermore, Social Security numbers represent one of the most detrimental forms of private information to have stolen. This is due to the multitude of fraudulent purposes to which they may be put, and the significant challenge individuals face in changing their Social Security numbers.

---

[22] 17 C.F.R. § 248.201 (2013).

[23] *Id.*

[24] *Your Personal Data is for Sale on the Dark Web. Here's How Much it Costs,* Digital Trends, (Oct. 16, 2019) *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[25] *Here's How Much Your Personal Information is Selling for on the Dark Web*, Experian (Dec. 6, 2017) *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/; *In the Dark*, VPN Overview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Feb. 12, 2025) (criminals can also purchase access to entire company data breaches from $900 to $4,500).

84.    According to the Social Security Administration, whenever an individual's Social Security number is compromised, the risk of unauthorized access to various sensitive records escalates. This includes bank accounts, credit cards, driving records, tax and employment histories, and other private information. Furthermore, since many organizations still rely on Social Security numbers as the primary identifier of a person, the exposure to identity theft and fraud persists.

85.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

86.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[27]

87.    Additionally, altering or invalidating a stolen Social Security number is a complex process. An individual cannot acquire a new Social Security number without substantial paperwork and evidence demonstrating actual misuse. In essence, preemptive

---

[26] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb 10, 2025).
[27] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Feb. 10, 2025).

measures to safeguard against potential misuse of a Social Security number are not feasible; an individual must provide evidence of ongoing fraudulent activity to qualify for a new number.

88.    However, obtaining a new Social Security number may not necessarily resolve the issue. Julie Ferguson from the Identity Theft Resource Center explains that credit bureaus and banks can swiftly link the new number to the old one, resulting in the transfer of all previous negative information to the new Social Security number. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft.[28]

89.    Theft of PHI, which was compromised in the Data Breach, is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records,

---

[28] *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (noting that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] Social Security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.").

and credit report may be affected."[29]

90.    The increased efficiency of electronic health records introduces the risk of privacy breaches. These records contain a wealth of sensitive information, including patient data, diagnoses, lab results, medications, prescriptions, and treatment plans, all of which are highly valuable to cybercriminals. A single patient's comprehensive record can fetch hundreds of dollars on the dark web. Consequently, PHI and PII have become sought-after commodities, fueling a thriving "cyber black market" where criminals openly trade stolen payment card numbers, Social Security numbers, and other personal data on various underground Internet platforms.

91.    Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[30] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[31] In short, this type of data breach is increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[32] According to account monitoring company LogDog, medical data sells for $50

---

[29] *Medical I.D. Theft*, EFraudPrevention, https://efraudprevention.net/home/education/?a= 187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20aff ected (last visited Feb. 12, 2025).

[30] Adil Hussain Seh, et al., *Healthcare Data Breaches: Insights and Implications*, NATIONAL LIBRARY OF MEDICINE (May 13, 2020) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.

[31] Steve Adler, *December 2019 Healthcare Data Breach Report*, THE HIPAA JOURNAL (Jan. 21, 2020) https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.

[32] Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breaches*, TENABLE (Mar. 10, 2021) https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

and up on the Dark Web.[33]

92.    According to Pam Dixon, executive director of World Privacy Forum, medical identity theft is an escalating and perilous crime that severely limits its victims' options for recovery. Victims often endure financial consequences, and, even more distressingly, they frequently encounter inaccuracies added to their personal medical records as a result of the thief's actions.[34]

93.    A study conducted by Experian revealed that the average cost of medical identity theft per incident is approximately $20,000. Additionally, the majority of victims of medical identity theft are compelled to cover out-of-pocket expenses for healthcare services they did not receive in order to reinstate their coverage. Further, almost half of medical identity theft victims lose their healthcare coverage following the incident, while nearly one-third experience an increase in insurance premiums. Alarmingly, 40 percent of victims are unable to fully resolve their identity theft ordeal.[35]

94.    Given the foregoing, the information compromised in the Data Breach holds far greater value compared to the loss of credit card information in a retailer data breach. In the latter scenario, victims have the option to cancel or close their credit and debit card accounts. However, the information compromised in this Data Breach cannot be simply

---

[33] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://news.sophos.com/en-us/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/.

[34] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

[35] *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Nov. 21, 2024).

"closed" and is exceedingly challenging, if not impossible, to alter.

95.    In addition to other forms of fraud, identity thieves may fraudulently acquire driver's licenses, government benefits, medical services, housing, or even provide false information to law enforcement.

96.    The fraudulent activity stemming from the Data Breach might remain undetected for an extended period, possibly years. There can be a considerable delay between the occurrence of harm and its detection, as well as between the theft of Private Information and its utilization. This was highlighted in a study conducted by the U.S. Government Accountability Office (GAO) on data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

97.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendants' Noncompliance with FTC Guidelines***

98.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

---

[36] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf.

99.     In 2016, the FTC revised its publication, "Protecting Personal Information: A Guide for Business," which outlined cybersecurity guidelines for businesses. These guidelines emphasize the importance of safeguarding personal patient information, appropriately disposing of unnecessary personal information, encrypting information stored on computer networks, comprehending network vulnerabilities, and implementing policies to address any security issues.[37]

100.    The guidelines also advocate for businesses to employ an intrusion detection system to promptly detect breaches as they happen, monitor all incoming traffic for signs of attempted system hacking, be vigilant for unusually large data transmissions from the system, and have a prepared response plan in place in the event of a breach.[38]

101.    Furthermore, the FTC advises companies to refrain from retaining private information for longer than necessary for transaction authorization, restrict access to sensitive data, mandate the use of complex passwords on networks, employ industry-proven security methods, monitor the network for any suspicious activity, and verify that third-party service providers have adopted reasonable security measures.

102.    The FTC has taken enforcement actions against businesses for inadequately safeguarding patient data, considering the failure to implement reasonable and appropriate measures to prevent unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15

---

[37] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 22, 2024).
[38] *Id.*

U.S.C. § 45. Orders resulting from these actions provide additional clarification on the steps businesses must take to fulfill their data security obligations.

103.    These FTC enforcement actions include actions against healthcare providers and healthcare adjacent companies like Defendants. *See, e.g.*, *In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Henry Ford) 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

104.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

105.    Defendants failed to properly implement basic data security practices.

106.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of their patients or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

107.    Upon information and belief, Defendants were at all times aware of their obligations to protect the Private Information of their patients, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private

Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

***Defendants' Noncompliance with HIPAA Guidelines***

108.    Presbyterian is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

109.    Presbyterian is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

110.    Thompson is a "business associate" for purposes of HIPAA and HITECH. *See* 45 C.F.R. § 160.103; 42 U.S.C. §17931.

111.    Thompson recognizes that it is a "business associate." *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (U.S. Department of Health and Human Services Office of Civil Rights Breach Portal where Thompson self-identifies as a "business associate").

112.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

113.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic

protected health information." 45 C.F.R. § 164.302.

114.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

115.    HIPAA's Security Rule mandates that Presbyterian:

a.    Safeguard the confidentiality, integrity, and availability of all electronic protected health information created, received, maintained, or transmitted by the covered entity or business associate;

b.    Shield against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Guard against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by its workforce.

116.    HIPAA further requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

117.    HIPAA and HITECH also obligated Defendants to implement policies and

procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

118.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[39]

119.    HIPAA requires a covered entity to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

120.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

121.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For

---

[39] U.S. DEP'T OF HEALTH & HUMAN SERVICES, *Breach Notification Rule*, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Feb. 12, 2025).

example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology ("NIST"), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[40]

### Defendants' Noncompliance with Industry Standards

122.    Experts in cybersecurity frequently highlight healthcare entities as particularly vulnerable to cyberattacks due to the high value of the Private Information they collect and maintain.

123.    Several best practices have been identified that, at a minimum, should be implemented by healthcare and healthcare adjacent entities in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these

---

[40] U.S. DEP'T OF HEALTH & HUMAN SERVICES, *Guidance on Risk Analysis*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Feb 12, 2025).

industry best practices, including a failure to implement multi-factor authentication.

124.    Standard cybersecurity practices for healthcare and healthcare adjacent entities include installing robust malware detection software, monitoring and limiting network ports, securing web browsers and email systems, setting up firewalls, switches, and routers, and ensuring physical security systems are protected. Additionally, it is essential to safeguard communication systems and train staff on critical security protocols. Defendants failed to adhere to these best practices, including neglecting to properly train staff.

125.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

126.    The aforementioned frameworks represent established industry standards for healthcare and healthcare adjacent entities. Based on available information, Defendants failed to comply with one or more of these accepted standards, thereby allowing the threat actor to exploit vulnerabilities and cause the Data Breach.

### Common Injuries

127.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the

hands of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent. Consequently, Plaintiffs and Class Members have sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of their Private Information; (iv) lost money, time, and opportunity costs associated with attempting to mitigate the effects of the Data Breach; (v) loss of benefit of the bargain; (vi) loss of the value of the unauthorized access to their Private Information permitted by Defendants; (vii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and increased risk to their Private Information, which remains unencrypted and accessible to unauthorized third parties and is still backed up in Defendants' possession, subject to further unauthorized disclosures unless Defendants implement appropriate and adequate protective measures.

### Data Breaches Heighten Victims' Risk of Identity Theft

128.    The unencrypted Private Information of Class Members is highly likely to be sold on underground markets or offered for sale on the dark web, as this is the common *modus operandi* of hackers.

129.    Unencrypted Private Information can also be obtained by companies that use it for targeted marketing without the consent of Plaintiffs and Class Members. In essence, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

130.    The connection between a data breach and the risk of identity theft is straightforward and well-established. Criminals acquire Private Information to monetize it,

33

often by selling the stolen data on the black market. Other criminals then purchase this information to commit various identity theft-related crimes, as discussed below.

131.    Plaintiffs' and Class Members' Private Information holds significant value for hackers and cyber criminals. The data stolen in the Data Breach has been, and will continue to be, used in various malicious ways, allowing criminals to exploit Plaintiffs and Class Members and profit from their misfortune.

132.    Recognizing the dangers posed by the exposure of Social Security numbers, state legislatures have implemented laws to mitigate these risks. Social Security numbers can be exploited for fraudulent activities and to obtain sensitive personal, financial, medical, and familial information, potentially causing significant harm to individuals. Initially intended for federal Social Security System administration, these numbers have since become widely used for identity verification purposes.

133.    Despite the risk of fraud associated with the theft of Social Security numbers, "just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[41] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."

134.    One such example of criminals piecing together bits and pieces of

---

[41] Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers,* THE NEW YORK TIMES (Mar. 20, 2013) https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

compromised private information for profit is the development of "Fullz" packages.[42]

135.    Through "Fullz" packages, cyber-criminals can merge two sources of private information, combining unregulated data available elsewhere with criminally obtained data. This process results in remarkably comprehensive and accurate dossiers on individuals.

136.    The emergence of "Fullz" packages indicates that the stolen private information from the Data Breach can readily be matched with Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. Essentially, even if specific details like emails, phone numbers, or credit card numbers were not part of the exfiltrated private information in the Data Breach, criminals can effortlessly compile a "Fullz" package and repeatedly sell it at inflated prices to unethical operators and criminal entities (like illicit telemarketers and scammers).

137.    The presence and widespread availability of "Fullz" packages indicate that the private information pilfered from the data breach can effortlessly be correlated with the

---

[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sept. 18, 2014) https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/).

unregulated data, such as insurance information, belonging to Plaintiffs and other Class Members.

138.    Consequently, even if specific details like insurance information were not compromised in the data breach, criminals can still effortlessly compile a comprehensive "Fullz" package. This detailed dossier can then be sold—and continually resold—to dishonest operators and other criminals, including illegal and fraudulent telemarketers.

***Mitigating Risk: Time Lost in Preventing Identity Theft and Fraud***

139.    In light of the acknowledged threat of identity theft, when a Data Breach transpires, and an individual receives notification from a company regarding the compromise of their Private Information, as in this instance, it is reasonable to anticipate that they will take measures and dedicate time to address the perilous scenario. This entails educating themselves about the breach and undertaking actions to minimize the risk of falling victim to identity theft or fraud. Neglecting to allocate time to review accounts or credit reports could potentially exacerbate financial harm. However, valuable time is squandered in this process.

140.    Plaintiffs and Class Members have already devoted significant time to, and will continue to invest time in the future, undertaking various prudent measures. These include researching and validating the authenticity of the Data Breach and diligently monitoring their financial accounts for any signs of suspicious activity, which could potentially take years to uncover. Consequently, the Data Breach has inflicted tangible harm on Plaintiffs and Class Members in the form of irreplaceable lost time dedicated to mitigation efforts.

141.    Plaintiffs' actions to mitigate the situation align with findings from the U.S. Government Accountability Office, as outlined in a 2007 report on data breaches. The report highlighted that individuals affected by identity theft encounter significant expenses and invest considerable time in rectifying damage to their reputation and credit history.[43]

142.    Plaintiffs' mitigation efforts are consistent with the recommendations provided by the FTC for individuals affected by data breaches. These steps include contacting the credit bureaus to place a fraud alert (with consideration of an extended fraud alert lasting up to seven years if identity theft occurs), reviewing credit reports, contacting companies to dispute fraudulent charges, implementing a credit freeze, and rectifying inaccuracies on credit reports.[44]

**Unconsented Disclosure of Private Information**

143.    Private Information constitutes valuable property rights.[45] Sensitive PII can fetch prices as high as $363 per record, as reported by the Infosec Institute. Additionally, there exists a thriving legitimate marketplace for PII. In 2019 alone, the data brokering industry was estimated to be valued at around $200 billion.[46]

---

[43] United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[44] Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Feb. 12, 2025).

[45] "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p.2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf.

[46] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Feb. 12, 2025).

144.    The data marketplace has reached a level of sophistication where patients have the option to directly sell their non-public information to a data broker. Subsequently, these brokers aggregate the data and furnish it to marketers or app developers.

145.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[47]

146.    Theft of PHI carries significant consequences. A thief could potentially exploit your identity or health insurance details to seek medical treatment, obtain prescription medications, submit claims to your insurance provider, or access other healthcare services. If the thief's health information becomes intertwined with data breach victim's, it could impact the victim's medical treatment, insurance coverage, payment records, and even the victim's credit report.

147.    The Data Breach has led to the compromise and unauthorized release of Plaintiffs' and Class Members' Private Information, which holds inherent market value in both legitimate and illicit markets. This unauthorized transfer of value occurred without any compensation provided to Plaintiffs or Class Members for their property, resulting in an economic loss. Furthermore, the Private Information is now easily accessible, and its exclusivity has been lost, leading to further devaluation.

148.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system

---

[47]  https://computermobilepanel.nielsen.com/ui/US/en/faqen.html  (last  visited  Feb.  12, 2025).

were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

149.    The fraudulent activity resulting from the Data Breach may not come to light for years.

150.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

151.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to, upon information and belief, over three hundred thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

152.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

153.    Considering the nature of the targeted attack in this case, involving sophisticated criminal activity and the sensitive Private Information at stake, there is a high likelihood that entire datasets of stolen information have either been or will be circulated on the black market or dark web. Criminals intend to exploit this Private Information for identity theft crimes, such as opening bank accounts in victims' names for purchases or

money laundering, filing fraudulent tax returns, securing loans or lines of credit, or submitting false unemployment claims.

154.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for insurance or unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

155.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

156.    The retail cost of credit monitoring and identity theft monitoring can be around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and attempt to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

### *Loss of Benefit of The Bargain*

157.    Furthermore, Defendants' poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Presbyterian and/or its agents for the provision of medical services, Plaintiffs and other reasonable patients understood and expected that they were, in part, paying for the services and necessary data security to protect the Private Information, when in fact, Presbyterian did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Presbyterian.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Jason Salazar*

158.    Plaintiff Salazar was a patient at Presbyterian.

159.    As a condition of receiving a healthcare service, he was required to provide his Private Information, directly or indirectly, to Defendants including among other things, his name, date of birth, sensitive medical information, and more.

160.    At the time of the Data Breach, Defendants retained Plaintiff Salazar's Private Information in their systems.

161.    Plaintiff Salazar is very careful about sharing his sensitive Private Information. Plaintiff Salazar stores any documents containing his Private Information in a safe and secure location. Plaintiff Salazar would not have entrusted his Private Information to Defendants had he known of Defendants' lax data security policies.

162.    Plaintiff Salazar received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Salazar's Private Information was improperly accessed and obtained by unauthorized third parties.

163.    Defendants deprived Plaintiff Salazar of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for over five months.

164.    As a result of the Data Breach, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Salazar made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and checking his credit monitoring services for fraud. Plaintiff

Salazar has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

165.   Plaintiff Salazar has also experienced an increased number of spam and suspicious calls, emails and texts following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

166.   Plaintiff Salazar suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to his Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

167.   The Data Breach has caused Plaintiff Salazar to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

168.   As a result of the Data Breach, Plaintiff Salazar anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

169.    As a result of the Data Breach, Plaintiff Salazar is at a present and continuing risk of identity theft for his lifetime. Plaintiff Salazar has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**Plaintiff Kristin Tafoya**

170.    Plaintiff Tafoya is a patient at Presbyterian having received services with them for at least ten years. Plaintiff Tafoya is also a current employee of Presbyterian having worked for Presbyterian since 2016.

171.    As a condition of receiving healthcare services and employment, she was required to provide her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, Social Security number, sensitive medical information, and more.

172.    At the time of the Data Breach, Defendants retained Plaintiff Tafoya's Private Information in their systems.

173.    Plaintiff Tafoya is very careful about sharing her sensitive Private Information. Plaintiff Tafoya stores any documents containing her Private Information in a safe and secure location. Plaintiff Tafoya would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

174.    Plaintiff Tafoya received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Tafoya's Private Information was improperly accessed and obtained by unauthorized third parties.

175.    Defendants deprived Plaintiff Tafoya of the earliest opportunity to guard

herself against the Data Breach's effects by failing to notify her about it for over five months.

176.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Tafoya made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and checking her credit monitoring services for fraud. Plaintiff Tafoya has spent approximately four to five hours dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred, researching the Data Breach, and contacting counsel. Plaintiff Tafoya has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured. Plaintiff Tafoya has also experienced an increased number of spam and suspicious calls, emails and texts following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

177.    Following the Data Breach, Plaintiff Tafoya received a notification through Experian that her information had been found on the Dark Web, indicating that her information was in the hands of cybercriminals.

178.    Plaintiff Tafoya suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity

costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

179.    The Data Breach has caused Plaintiff Tafoya to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

180.    As a result of the Data Breach, Plaintiff Tafoya anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

181.    As a result of the Data Breach, Plaintiff Tafoya is at a present and continuing risk of identity theft for her lifetime. Plaintiff Tafoya has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Denise Sandoval Duran***

182.    Plaintiff Duran was a patient at Presbyterian.

183.    As a condition of receiving a healthcare service, she was required to provide her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

184.    At the time of the Data Breach, Defendants retained Plaintiff Duran's Private Information in their systems.

185.    Plaintiff Duran is very careful about sharing her sensitive Private Information. Plaintiff Duran stores any documents containing her Private Information in a safe and secure location. Plaintiff Duran would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

186.    Plaintiff Duran received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Duran's Private Information was improperly accessed and obtained by unauthorized third parties.

187.    Defendants deprived Plaintiff Duran of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

188.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Duran made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and contacting counsel. Plaintiff Duran has spent significant time dealing with the Data Breach—valuable time Plaintiff Duran otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

189.    Plaintiff Duran has also experienced an increased number of spam and suspicious calls, emails and texts following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

190. Plaintiff Duran suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

191. The Data Breach has caused Plaintiff Duran to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

192. As a result of the Data Breach, Plaintiff Duran anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

193. As a result of the Data Breach, Plaintiff Duran is at a present and continuing risk of identity theft for her lifetime. Plaintiff Duran has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Heidi Mathiasen***

194. Plaintiff Mathiasen was a patient at Presbyterian.

195.    As a condition of receiving a healthcare service, she was required to provide his Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

196.    At the time of the Data Breach, Defendants retained Plaintiff Mathiasen's Private Information in their systems.

197.    Plaintiff Mathiasen is very careful about sharing her sensitive Private Information. Plaintiff Mathiasen stores any documents containing her Private Information in a safe and secure location. Plaintiff Mathiasen would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

198.    Plaintiff Mathiasen received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Mathiasen's Private Information was improperly accessed and obtained by unauthorized third parties.

199.    Defendants deprived Plaintiff Mathiasen of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

200.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Mathiasen made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and checking her financial accounts and statements. Plaintiff Mathiasen has spent significant time dealing with the Data Breach— valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

201.    Plaintiff Mathiasen suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

202.    The Data Breach has caused Plaintiff Mathiasen to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

203.    As a result of the Data Breach, Plaintiff Mathiasen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

204.    As a result of the Data Breach, Plaintiff Mathiasen is at a present and continuing risk of identity theft for her lifetime. Plaintiff Mathiasen has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

*Plaintiff Paula Ortiz*

205.    Plaintiff Ortiz is a patient at Presbyterian.

206.    As a condition of receiving a healthcare service, she was required to provide her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

207.    At the time of the Data Breach, Defendants retained Plaintiff Ortiz's Private Information in their systems.

208.    Plaintiff Ortiz is very careful about sharing her sensitive Private Information. Plaintiff Ortiz stores any documents containing her Private Information in a safe and secure location. Plaintiff Ortiz would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

209.    Plaintiff Ortiz received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Ortiz's Private Information was improperly accessed and obtained by unauthorized third parties.

210.    Defendants deprived Plaintiff Ortiz of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

211.    As a result of the Data Breach, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Ortiz made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and checking her credit monitoring services for fraud. Plaintiff Ortiz has spent significant time dealing with the Data Breach—valuable time Plaintiff

otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

212.    Thus far Plaintiff Ortiz has spent approximately five hours attempting to mitigate the fallout of the Data Breach.

213.    Plaintiff Ortiz has also experienced an increased number of spam and suspicious calls, emails and texts following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

214.    After the Data Breach, Plaintiff Ortiz was notified that cybercriminals attempted to purchase an Apple "Mac" laptop on her Amazon.com account. The payment information on her Amazon account is the same payment information that Plaintiff Ortiz provided to Presbyterian (to pay for her appointments).

215.    Plaintiff Ortiz suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

216.    The Data Breach has caused Plaintiff Ortiz to suffer fear, anxiety, and stress,

which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

217. As a result of the Data Breach, Plaintiff Ortiz anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

218. As a result of the Data Breach, Plaintiff Ortiz is at a present and continuing risk of identity theft for her lifetime. Plaintiff Ortiz has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff M.R.***

219. Plaintiff M.R. was a patient at Presbyterian.

220. As a condition of receiving a healthcare service, they were required to provide their Private Information, directly or indirectly, to Defendants including among other things, their name, date of birth, Social Security number, sensitive medical information, and more.

221. At the time of the Data Breach, Defendants retained Plaintiff M.R.'s Private Information in their systems.

222. Plaintiff M.R. is very careful about sharing their sensitive Private Information. Plaintiff M.R. stores any documents containing their Private Information in a safe and secure location. Plaintiff M.R. would not have entrusted their Private Information to Defendants had they known of Defendants' lax data security policies.

223. Plaintiff M.R. received the Notice Letter, by U.S. mail, from Defendant

Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff M.R.'s Private Information was improperly accessed and obtained by unauthorized third parties.

224.    Defendants deprived Plaintiff M.R. of the earliest opportunity to guard themselves against the Data Breach's effects by failing to notify them about it for over five months.

225.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff M.R. made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and contacting counsel. Plaintiff M.R. has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

226.    Plaintiff M.R. suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to their Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

227.    The Data Breach has caused Plaintiff M.R. to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed them of key details about the Data Breach's occurrence.

228.    As a result of the Data Breach, Plaintiff M.R. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

229.    As a result of the Data Breach, Plaintiff M.R. is at a present and continuing risk of identity theft for their lifetime. Plaintiff M.R. has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff D.L.***

230.    Plaintiff D.L. is a patient at Presbyterian.

231.    As a condition of receiving a healthcare service, they were required to provide their Private Information, directly or indirectly, to Defendants including among other things, their name, date of birth, sensitive medical information, and more.

232.    At the time of the Data Breach, Defendants retained Plaintiff D.L.'s Private Information in their systems.

233.    Plaintiff D.L. is very careful about sharing their sensitive Private Information. Plaintiff D.L. stores any documents containing their Private Information in a safe and secure location. Plaintiff D.L. would not have entrusted their Private Information to Defendants had they known of Defendants' lax data security policies.

234.    Plaintiff D.L. received the Notice Letter, by U.S. mail, from Defendant

Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff D.L.'s Private Information was improperly accessed and obtained by unauthorized third parties.

235.   Defendants deprived Plaintiff D.L. of the earliest opportunity to guard themselves against the Data Breach's effects by failing to notify them about it for over five months.

236.   As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff D.L.'s guardians made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and contacting counsel. Plaintiff D.L.'s guardians have spent significant time dealing with the Data Breach—valuable time Plaintiff D.L.'s guardians otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

237.   Plaintiff D.L. suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to their Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

238.    The Data Breach has caused Plaintiff D.L. to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed them of key details about the Data Breach's occurrence.

239.    As a result of the Data Breach, Plaintiff D.L. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

240.    As a result of the Data Breach, Plaintiff D.L. is at a present and continuing risk of identity theft for their lifetime. Plaintiff D.L. has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Kristen Cochrane

241.    Plaintiff Cochrane is a patient at Presbyterian. Plaintiff Cochrane is also a current employee of Presbyterian having worked for Presbyterian since approximately August 1998.

242.    As a condition of receiving healthcare services and employment, she was required to provide her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

243.    At the time of the Data Breach, Defendants retained Plaintiff Cochrane's Private Information in their systems.

244.    Plaintiff Cochrane is very careful about sharing her sensitive Private Information. Plaintiff Cochrane stores any documents containing her Private Information in a safe and secure location. Plaintiff Cochrane would not have entrusted her Private

Information to Defendants had she known of Defendants' lax data security policies.

245.    Plaintiff Cochrane received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Cochrane's Private Information was improperly accessed and obtained by unauthorized third parties.

246.    Defendants deprived Plaintiff Cochrane of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

247.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Cochrane made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter. Plaintiff Cochrane has spent approximately three hours dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred, changing her passwords, researching the Data Breach, and contacting counsel. Plaintiff Cochrane has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

248.    Following the Data Breach, Plaintiff Cochrane received notifications through Google that her information had been found on the Dark Web, indicating that her information was in the hands of cybercriminals.

249.    Plaintiff Cochrane suffered actual injury from having her Private Information

compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to his Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

250.    The Data Breach has caused Plaintiff Cochrane to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

251.    As a result of the Data Breach, Plaintiff Cochrane anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

252.    As a result of the Data Breach, Plaintiff Cochrane is at a present and continuing risk of identity theft for her lifetime. Plaintiff Cochrane has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Mary Martinez***

253.    Plaintiff Martinez is a patient at Presbyterian.

254.    As a condition of receiving a healthcare service, she was required to provide

her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

255.    Plaintiff Martinez received HIPAA and Privacy Notices from Presbyterian as part of receiving medical treatment.

256.    At the time of the Data Breach, Defendants retained Plaintiff Martinez's Private Information in their systems.

257.    Plaintiff Martinez is very careful about sharing her sensitive Private Information. Plaintiff Martinez stores any documents containing her Private Information in a safe and secure location. Plaintiff Martinez would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

258.    Plaintiff Martinez received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Martinez's Private Information was improperly accessed and obtained by unauthorized third parties.

259.    Defendants deprived Plaintiff Martinez of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

260.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Martinez made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and monitoring her financial accounts for suspicious activity. Plaintiff Martinez has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including

but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

261.    Plaintiff Martinez has also experienced an increased number of spam emails following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

262.    Plaintiff Martinez suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

263.    The Data Breach has caused Plaintiff Martinez to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

264.    As a result of the Data Breach, Plaintiff Martinez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

265.    As a result of the Data Breach, Plaintiff Martinez is at a present and

continuing risk of identity theft for her lifetime. Plaintiff Martinez has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Mikah Wuorinen***

266.    Plaintiff Wuorinen was a patient at Presbyterian.

267.    As a condition of receiving a healthcare service, she was required to provide her Private Information, directly or indirectly, to Defendants including among other things, her name, date of birth, sensitive medical information, and more.

268.    At the time of the Data Breach, Defendants retained Plaintiff Wuorinen's Private Information in their systems.

269.    Plaintiff Wuorinen is very careful about sharing her sensitive Private Information. Plaintiff Wuorinen stores any documents containing her Private Information in a safe and secure location. Plaintiff Wuorinen would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

270.    Plaintiff Wuorinen received the Notice Letter, by U.S. mail, from Defendant Thompson, dated November 6, 2024. According to the Notice Letter, Plaintiff Wuorinen's Private Information was improperly accessed and obtained by unauthorized third parties.

271.    Defendants deprived Plaintiff Wuorinen of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for over five months.

272.    As a result of the Data Breach notice, and at the direction of Defendant Thompson's Notice Letter, Plaintiff Wuorinen made reasonable efforts to mitigate the

impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and checking her credit monitoring services for fraud. Plaintiff Wuorinen has spent approximately four to five hours dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred, researching the Data Breach, and contacting counsel. Plaintiff Wuorinen has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

273.    Plaintiff Wuorinen has also experienced an increased number of spam and suspicious calls, emails and texts following the Data Breach and believes that these may be phishing attempts designed to gain access to additional personal information.

274.    Plaintiff Wuorinen suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) loss of the value of access to her Private Information; and (vi) the continued and certainly increased risk to Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information.

275.    The Data Breach has caused Plaintiff Wuorinen to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

276.    As a result of the Data Breach, Plaintiff Wuorinen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

277.    As a result of the Data Breach, Plaintiff Wuorinen is at a present and continuing risk of identity theft for her lifetime. Plaintiff Wuorinen has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ALLEGATIONS**

268.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All natural persons residing in the United States whose Private Information was compromised as a result of the Data Breach (the "Class").**

269.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family

members.

270.    Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

271.    <u>Numerosity</u>: The patients of the Class are so numerous that joinder of all patients is impracticable, if not completely impossible. Thus far, Defendants have disclosed that 305,088 individuals' information was compromised in the Data Breach.

272.    <u>Commonality</u>: Common questions of law and fact exist as to all patients of the Class and predominate over any questions affecting solely individual patients of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, are the following:

a.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

b.  Whether Defendants had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.  Whether Defendants had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.  How and when Defendants learned of the Data Breach;

f.  Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been

compromised;

g.   Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct; and

k.   Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

273.   Typicality: Plaintiffs' claims are typical of those of the other patients of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Class.

274.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final

injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

275.    <u>Adequacy:</u> Plaintiffs will serve as fair and effective representatives for the Class Members, possessing no conflicting interests that would hinder the protection of their rights. The relief sought by Plaintiffs aligns with the collective interests of the Class, without any adverse implications for its members. The infringements upon Plaintiffs' rights and the damages incurred are emblematic of those experienced by other Class Members. Moreover, Plaintiffs have engaged legal counsel adept in navigating intricate class action and data breach litigation, demonstrating a commitment to vigorously pursue this case.

276.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

277.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

278.   The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

279.   Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

280.   Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

281.   Further, Defendants have acted on grounds that apply generally to the Class

as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiffs and the Class against Defendants)**

282.    Plaintiffs re-allege and incorporate by reference all preceding allegations, as if fully set forth herein.

283.    Presbyterian requires its patients, including Plaintiffs and Class Members, to submit confidential Private Information as part of the standard process for receiving healthcare services or employment. As such, Presbyterian owed Plaintiffs and Class Members a non-delegable duty to protect the Private Information it collects.

284.    This duty arose under common law, state and federal regulations, and Presbyterian's own policies, which promised to safeguard patient data from unauthorized access or disclosure. By collecting, maintaining, and sharing Plaintiffs' Private Information as part of its healthcare operations, Presbyterian assumed a legal and ethical obligation to protect such sensitive data.

285.    Presbyterian's duty also included the obligation to: (a) implement reasonable security practices and safeguards consistent with industry standards; (b) conduct adequate due diligence before entrusting third parties, such as Thompson, with Private Information; and (c) supervise and ensure that third parties adhered to the same rigorous standards for safeguarding Private Information.

286.    Thompson voluntarily undertook a duty to protect Plaintiffs' and Class

Members' Private Information when it accepted access to and custody of this sensitive data from Presbyterian. By doing so, Thompson assumed a responsibility to maintain reasonable security measures to prevent unauthorized access, theft, or misuse of the information.

287.    This duty arose from Thompson's business operations, its acceptance of the sensitive records, and applicable legal and ethical obligations, including the understanding that it was responsible for safeguarding the entrusted Private Information consistent with industry standards and best practices.

288.    Defendants breached their duties under the FTC Act, HIPAA, and other relevant standards, demonstrating negligence by failing to implement reasonable measures to protect Class Members' Private Information.

289.    Presbyterian breached its duty to protect Plaintiffs' and Class Members' Private Information by:

   a. Failing to adequately vet Thompson's data security protocols and capabilities before entrusting it with Private Information;

   b. Failing to supervise Thompson's handling of sensitive Private Information, despite knowing or having reason to know of the risks associated with sharing patient data with third parties;

   c. Failing to ensure Thompson maintained industry-standard security systems, protocols, and practices to protect the Private Information in its possession before sharing it with Thompson;

   d. Transferring sensitive Private Information without sufficient oversight

mechanisms to ensure its protection; and

e.  Neglecting to remove Private Information of former patients that was no longer required to be retained according to regulations.

290.  Likewise, Thompson breached its duty to protect Plaintiffs' and Class Members' Private Information by:

a.  Neglecting to adopt, implement, and maintain sufficient security measures to safeguard Class Members' Private Information;

b.  Inadequately monitoring the security of its networks and systems;

c.  Allowing unauthorized access to Class Members' Private Information;

d.  Failing to promptly detect that Class Members' Private Information had been compromised; and

e.  Failing to promptly and adequately inform Class Members about the occurrence and extent of the Data Breach, preventing them from taking appropriate measures to mitigate the risk of identity theft and other damages.

291.  Defendants' duties extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship.

292.  Defendants knew or should have known that Private Information, particularly within the healthcare and legal services contexts, is a prime target for

cybercriminals. The sensitive nature of this data and its value on the black market made Plaintiffs and Class Members part of a foreseeable, high-risk group that would suffer harm if their Private Information was not adequately protected.

293.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

294.    There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

295.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) the unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) loss of the value of access to Private Information; (vii) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (viii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (ix) nominal damages; and (x) the continued and certainly increased

risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

296.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

297.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to nominal, compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class against Defendants)

298.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above, as if fully set forth herein.

299.    According to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants were obligated to furnish fair and adequate computer systems and data security practices to protect the Private Information of both Plaintiffs and Class Members.

300.    Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical,

and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

301.    Defendants breached their duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

302.    Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se.*

303.    Plaintiffs and Class Members are within the class of persons the statutes were intended to protect and the harm to Plaintiffs and Class Members resulting from the Data Breach was the type of harm against which the statutes were intended to prevent.

304.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

305.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that by failing to meet their duties, Defendants' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

306.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to nominal, compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class against Presbyterian)

307.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein, and bring this claim solely against Defendant Presbyterian.

308.    Plaintiffs and Class Members were required to deliver their Private Information to Presbyterian as part of the process of obtaining services at Presbyterian. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Presbyterian in exchange for services.

309.    Presbyterian solicited, offered, and invited Class Members to provide their private information as part of its regular business practices. Plaintiffs and Class Members accepted Presbyterian's request and provided their Private Information to Defendants.

310.    Presbyterian solicited, offered, and invited Class Members to provide their Private Information as part of its regular business practices. Plaintiffs and Class Members accepted Presbyterian's request and provided their Private Information to Presbyterian solicited, offered, and invited Class Members to provide their Private Information as part of its regular business practices.

311.    Plaintiffs and Class Members entrusted their Private Information to Presbyterian. In so doing, Plaintiffs and Class Members entered into implied contracts with Presbyterian by which Presbyterian agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

312.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Presbyterian's data security practices complied with relevant laws and regulations (including HIPAA and FTC guidelines on data security) and were consistent with industry standards.

313.    Implicit in the agreement between Plaintiffs and Class Members and Defendants to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

314.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Presbyterian, on the other, is demonstrated by their conduct and course of dealing.

315.    On information and belief, at all relevant times Presbyterian promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

316.    On information and belief, Presbyterian further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private

Information would remain protected.

317.    Plaintiffs and Class Members paid money to Presbyterian with the reasonable belief and expectation that Presbyterian would use part of its earnings to obtain adequate data security. Presbyterian failed to do so.

318.    Plaintiffs and Class Members would not have entrusted their Private Information to Presbyterian in the absence of the implied contract between them and Presbyterian to keep their information reasonably secure.

319.    Plaintiffs and Class Members would not have entrusted their Private Information to Presbyterian in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

320.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

321.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Presbyterian.

322.    Presbyterian breached the implied contracts it made with Plaintiffs and Class Members by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and Class Members once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

323.    Presbyterian breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard

Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of Private Information and storage of other personal information after Presbyterian knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

324.    As a direct and proximate result of Presbyterian's breach of the implied contracts, Plaintiffs and Class Members sustained injuries and damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) loss of the value of access to the personal information; (vii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Presbyterian's possession and is subject to further unauthorized disclosures so long as Presbyterian fails to undertake appropriate and adequate measures to protect the Private Information.

325.    As a direct and proximate result of Presbyterian's breach of the implied contracts, Plaintiffs and Class Members are entitled to damages, including compensatory, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class against Presbyterian)

326.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein, and bring this claim solely against Defendant Presbyterian.

327.    Plaintiffs bring this count as an alternative to the breach of implied contract claim (Count III) above.

328.    Plaintiffs and Class Members conferred a monetary benefit on Presbyterian. Specifically, they paid Presbyterian and/or its agents for the provision of services and in so doing also provided Presbyterian with their Private Information. In exchange, Plaintiffs and Class Members should have received from Presbyterian the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

329.    Presbyterian knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Presbyterian profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

330.    Presbyterian failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

331.    Presbyterian acquired the Private Information through inequitable record retention, having failed to investigate and/or disclose the inadequate data security practices

previously mentioned.

332.    If Plaintiffs and Class Members had known that Presbyterian would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information at Presbyterian or obtained services at Presbyterian.

333.    Presbyterian enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Presbyterian instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Presbyterian's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

334.    Under the circumstances, it would be unjust for Presbyterian to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

335.    As a direct and proximate result of Presbyterian's conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the value of ongoing identity monitoring and

protection services necessitated by the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Presbyterian's possession and is subject to further unauthorized disclosures so long as Presbyterian fails to undertake appropriate and adequate measures to protect the Private Information.

336.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Presbyterian and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Presbyterian from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

337.    Plaintiffs and Class Members may not have an adequate remedy at law against Presbyterian, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiffs and the Class against Thompson)**

338.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein.

339.    Upon information and belief, Thompson entered into materially identical contracts with its clients, including Presbyterian, to provide legal services, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

340.    Such contracts were made expressly for the benefit of Plaintiffs and Class Members, as it was their Private Information that Thompson agreed to receive and protect. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and Class Members was the direct and primary objective of the contracting parties, and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

341.    Thompson knew that if it was to breach these contracts with Presbyterian, Plaintiffs and Class Members would be harmed.

342.    Thompson breached its contracts with Presbyterian and, as a result, Plaintiffs and Class Members were affected by this Data Breach when Thompson failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

343.    As foreseen, Plaintiffs and Class Members were harmed by Thompson's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

344.    As a direct and proximate result of Thompson's breach of the third-party beneficiary contracts, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT VI
### Unjust Enrichment
### (On Behalf of Plaintiffs and Class Members against Thompson)

345.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein.

346.    Plaintiffs and Class Members conferred a monetary benefit on Thompson, albeit indirectly, through Presbyterian. In so doing, they also provided Thompson with their Private Information. In exchange, Plaintiffs and Class Members should had their Private Information protected with adequate data security.

347.    Thompson knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Thompson profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

348.    Thompson failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

349.    Thompson acquired the Private Information through inequitable record retention, having failed to investigate and/or disclose the inadequate data security practices previously mentioned.

350.    If Plaintiffs and Class Members had known that Thompson (one of Presbyterian's vendors) would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Presbyterian or obtained services at

Presbyterian.

351.    Thompson enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Thompson instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Thompson's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

352.    Under the circumstances, it would be unjust for Thompson to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

353.    As a direct and proximate result of Thompson's conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Thompson's possession and is subject to further

unauthorized disclosures so long as Thompson fails to undertake appropriate and adequate measures to protect the Private Information.

354.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Thompson and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Thompson from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiffs and Class Members may seek restitution or compensation.

355.    Plaintiffs and Class Members may not have an adequate remedy at law against Thompson, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VII
## Breach of Fiduciary Duty of Confidentiality
### (On Behalf of Plaintiffs and the Class against Defendants)

356.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein.

357.    At all times relevant hereto, Defendants owed, and owes, a fiduciary duty to Plaintiffs and the proposed class pursuant to Missouri common law, to keep Plaintiffs' Personal Information confidential.

358.    The fiduciary duty of privacy imposed by Missouri law is explicated under the procedures set forth in the Health Insurance Portability and Accountability Act Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which requires a covered entity or business associate to apply appropriate administrative, technical, and physical safeguards to protect the privacy of

patient medical records.

359.    Defendants breached their fiduciary duty to Plaintiffs by disclosing Plaintiffs and the other Classes' Members PHI and PII to unauthorized third-parties.

360.    As a direct result of Defendants' breach of fiduciary duty of confidentiality and the disclosure of Plaintiffs' confidential Personal Information, Plaintiffs and the proposed Classes' Members suffered damages.

361.    As a direct result of Defendants' breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Classes confidential medical information, Plaintiffs and the members of the Classes suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

362.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and

abuse; and (b) remains backed up in Thompson's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

<u>**COUNT VIII**</u>
**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT, MO. REV. STAT. § 407.010,** *et seq.*
**(On Behalf of Plaintiffs and the Class against Defendants)**

363.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein.

364.    RSMo. 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. . . ."

365.    An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

366.    15 CSR 60-8.040 provides that it is "[a]n unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith."

367.    Plaintiffs and Defendants are "persons" within the meaning of section

407.010 (5).

368.    Merchandise is defined by the Missouri Merchandising Practices Act ("MMPA") to include the providing of "services" and, therefore, encompasses healthcare services and legal services.

369.    Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

370.    Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

371.    Plaintiffs' and the Class Members' goods and services purchased from Defendants were for "personal, family or household purposes" within the meaning of the MMPA.

372.    As set forth herein, Defendants' acts, practices and conduct violate section 407.010(1) in that, among other things, Defendants have used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

373.    Defendants' unfair, unlawful and deceptive acts, practices and conduct include: (i) representing to patients, either directly or indirectly, that they will not disclose their sensitive personal health information to an unauthorized third party or parties; (ii) failing to implement security measures such as securing the records in a safe place; and (iii) failing to train personnel.

374.    Defendants' conduct also violates the enabling regulations for the MMPA because it: (i) offends public policy; (ii) is unethical, oppressive and unscrupulous; (iii) causes substantial injury to consumers; (iv) it is not in good faith; (v) is unconscionable; and (vi) is unlawful. *See* Mo. Code Regs. Ann tit. 15, Section 60-8.

375.    As a direct and proximate result of Defendants' unfair and deceptive acts, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) unconsented disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) the value of ongoing identity monitoring and protection services necessitated by the Data Breach; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Thompson's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information. As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and Class Members have further suffered damages in that they (1) paid more for medical record privacy protections than they otherwise would have, and (2) paid for medical record privacy protections that they did not receive. In this respect, Plaintiffs and Class Members have not received the benefit of the bargain and have suffered an ascertainable loss.

376.    Plaintiffs, on behalf of themselves and the Class, seek actual damages for all monies paid to Defendants in violation of the MMPA. In addition, Plaintiffs seeks attorneys' fees.

## COUNT IX
### Declaratory Judgment
### (On Behalf of Plaintiffs and the Class against Defendants)

377.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 281 above as if fully set forth herein.

378.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et se*q., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal statutes described in this Consolidated Complaint.

379.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further cyberattacks and data breaches that could compromise their Private Information.

380.    Defendants still possess Private Information pertaining to Plaintiffs and Class Members, which means their Private Information remains at risk of further breaches due to Defendants' inadequate data security measures. Plaintiffs and Class Members continue to suffer injuries resulting from the compromise of their Private Information and remain at imminent risk that additional breaches will occur in the future.

381.    Pursuant to the Declaratory Judgment Act, Plaintiffs seek a declaration that: (a) Defendants' existing data security measures fail to comply with their obligations and duties of care; and (b) In order to comply with their obligations and duties of care, Defendants must:

a.  Implement policies and procedures to ensure that any parties with whom they share sensitive Private Information maintain reasonable, industry-standard security measures, including, but not limited to, those listed below;

b.  Purge, delete, or securely destroy Plaintiffs' and Class Members' Private Information if it is no longer necessary for essential business functions, so it is not subject to further theft; and

c.  Implement and maintain reasonable, industry-standard security measures, including but not limited to the following: (i) Engaging third-party security auditors/penetration testers and internal security personnel to conduct regular testing, including simulated attacks, penetration tests, and audits on Defendants' systems, and promptly addressing any problems or vulnerabilities detected; (ii) Utilizing automated security monitoring through third-party security auditors and internal personnel; (iii) Auditing, testing, and training security personnel on new or updated procedures; (iv) Encrypting Private Information and segmenting it with firewalls and access controls to prevent hackers from accessing multiple areas of Defendants' systems in the event of a breach; (v) Purging, deleting, and securely destroying Private Information that is no longer necessary for essential

business operations; (vi) Conducting regular database scanning and security checks; (vii) Providing ongoing employee education on best security practices; (viii) Implementing multi-factor authentication and the Principle of Least Privilege ("POLP") to combat system-wide cyberattacks; and (ix) Routinely conducting internal training to educate security personnel on breach identification, containment, and response protocols.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendants and that the Court grants the following:

A.    An Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.    Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    Injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.    An award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    Prejudgment interest on all amounts awarded; and

G.     Such other relief the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: February 20, 2025                    Respectfully Submitted,

                                            *By: /s/ Norman E. Siegel*
                                            Norman E. Siegel (SBN: 44378)
                                            **STUEVE SIEGEL LLP**
                                            460 Nichols Road Suite 200
                                            Kansas City, MO 64112
                                            T: 816-714-7100
                                            siegel@stuevesiegel.com

                                            Jeff Ostrow (*pro hac vice*)
                                            **KOPELOWITZ OSTROW PA**
                                            One West Las Olas Blvd. Suite 500
                                            Fort Lauderdale, FL 33301
                                            T: 954-525-4100
                                            F: 954-525-4300
                                            ostrow@kolawyers.com

                                            Raina C. Borrelli (*pro hac vice*)
                                            **STRAUSS BORRELLI PLLC**
                                            980 N. Michigan Avenue, Suite 1610
                                            Chicago IL, 60611
                                            T: (872) 263-1100
                                            F: (872) 263-1109
                                            raina@straussborrelli.com

                                            *Interim Co-Lead Class Counsel*

                                            Andrew Shamis (SBN: 76124)
                                            **SHAMIS AND GENTILE PA**
                                            14 N.E. 1st Ave Suite 705
                                            Miami, FL 33132
                                            T: 305-479-2299
                                            F: 786-623-0915
                                            ashamis@shamisgentile.com

                                            Leigh S. Montgomery*
                                            **EKSM, LLP**
                                            1105 Milford Street

Houston, Texas 77006
T: (888) 350-3931
F: (888) 276-3455
lmontgomery@eksm.com

Gary M. Klinger (*pro hac vice*)
**MILBERG COLEMAN PLLC**
227 W. Monroe Street Suite 2100
Chicago, IL 60606
T: 866-252-0878
gklinger@milberg.com

Terence R. Coates*
Spencer D. Campbell*
**MARKOVITS, STOCK &
DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
T: (513) 651-3700
tcoates@msdlegal.com
scampbell@msdlegal.com

William B. Federman*
Jessica A. Wilkes*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
T: (405) 235-1560
wbf@federmanlaw.com
jaw@federmanlaw.com

Maureen M. Brady (SBN: 57800)
**MCSHANE AND BRADY LLC**
4006 Central Street
Kansas City, MO 64111
T: 816-888-8010
mbrady@mcshanebradylaw.com

Lori G. Feldman*
Michael Liskow (*pro hac vice*)
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520

93

T: (917) 983-9321
lfeldman@4-justice.com
mliskow@4-justice.com

*Attorneys for Plaintiffs and the Proposed Class*

*Application for admission *pro hac vice*
forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record, below, via the ECF system.

By:    */s/ Norman E. Siegel*